# CASES

ARGUED AND DETERMINED

IN

# THE SUPREME COURT

OF THE

## STATE OF KANSAS,

DURING THE TERM COMMENCING JULY, 1863.

THE STATE OF KANSAS *ex rel.* DANIEL M. ADAMS v.
GEORGE S. HILLYER.*

*Quo Warranto.*

By Constitutional provision, all impeachments are to be tried by the Senate, the Senators when sitting for that purpose being sworn, and a concurrence of two-thirds of those elected being necessary to a conviction, but as to when the Senate shall sit for the purpose or how the trial shall be conducted, the Constitution is silent.

In the absence of express provision, the common law "will regulate, interpret and control the powers and duties of the Court of Impeachment." *Semble,* this common law rule is applicable only to the trial and proceedings *held* not applicable in determining questions relating to the organization of the Court—the body that prefers as well as that which tries the charges being unknown to the common law and dissimilar to the British Parliament. Distinction as to impeachment pointed out.

The independent jurisdiction of the Senate of Kansas as a Court of Impeachment maintained and *held* that there is no usage or right of attendance on a trial of impeachment by the House of Representatives.

By express provision of law the Senate, with the consent of the House, when organized and sitting as a Court of Impeachment, may adjourn to any period during their term of office not beyond the next regular meeting of the Legislature, whether the House be in session or not at such time,

---

*This case and "THE STATE OF KANSAS *ex rel.* DANIEL W. ADAMS v. JOHN W. ROBINSON," were submitted on the same agreed statement of facts, and the two cases submitted and determined at the same time.

3

and if it confine its acts within its duties as an independent body, they will be valid. It was competent for our Legislature to pass a law authorizing such action.

The passage of the resolution of the House asking the Senate to set the trial for a certain day, and the adjournment of the Senate sitting as a Court to that day, *held* an assent of the House to such adjournment, and within the meaning of the Constitution; and the passage afterwards of the concurrent resolution adjourning the Legislature *sine die*, was with reference to the law and the previous adjournment of the Senate sitting as a Court, and the meeting of such Court was not in conflict with it.

The different resolutions of each branch of the Legislature and acts of both, relating to the same subject matter are to be taken together.

There is no constitutional inhibition of the session of one branch of the Legislature when the other is not in session; and, *Semble*, the separate action of one body may be valid in the absence or non-organization of the other.

Constitutional provisions and limitations relating to the meeting and ajourning of the Houses of the Legislature, pointed out.

The facts in the case were agreed upon substantially as follows:

February 14, 1862. The House by resolution impeached John W. Robinson and Geo. S. Hillyer.

February 15, 1862. The House by its committee notified the Senate of the impeachments.

February 15, 1862. The House appointed a committee of managers to conduct the impeachments.

February 18, 1862. The Senate presented rules to be observed in cases of impeachment.

February 26, 1862. Replication of House filed.

February 26, 1862. Articles of impeachment of Hillyer adopted by House and presented to the Senate.

February 27, 1862. George S. Hillyer appears by his counsel, Senate sworn and defendant plead.

February 28, 1862. Replication to Hillyer's plea filed.

February 27, 1862. Resolution adopted by the House requesting Senate to postpone the trial to such time as managers should deem necessary.

February 26, 1862. Resolution asking Senate to fix first Monday in June for trial of impeachments. Passed.

The State ex rel. Adams v. Hillyer.

February 28, 1862.  On motion of managers the trial of Robinson was fixed for 1st Monday, and Hillyer for 1st Thursday of June.

February 28, 1862.  On motion of managers the Court adjourned to the 1st Monday in June.

March 1862.  Joint resolution passed adjourning both Houses *sine die*.

June 2d, 1862.  The Court of Impeachment commenced and proceeded with the trial of Robinson, and afterwards in due time of Hillyer, when judgment was pronounced against him on the 16th of June, 1862.

Information in Supreme Court, in the nature of a *quo warranto* exhibited upon the relation of Daniel M. Adams by the Attorney General of the State, for the purpose of removing Hillyer, respondent, from the office of Auditor of the State.  The information states that Hillyer since the 16th day of June, A. D., 1862, hath used, exercised and held, and still doth use and exercise the office of Auditor of the State of Kansas without lawful warrant or authority therefor : That the said Hillyer was impeached by the House of Representatives on the 14th day of February, A. D., 1862, by articles duly presented to the Senate, and that on the 16th day of June thereafter the Senate, sitting for the trial of said accusation, pronounced a judgment of guilty, and of removal from the said office of Auditor, of the said Hillyer.

The respondent by his plea did not controvert the facts set forth in the information, but asserts that the body that pronounced the judgment had no constitutional existence, and therefore the judgment was a nullity.

Other facts appear in the opinion of the Court.

*S. A. Stinson*, Attorney General for relator.

*Wilson Shannon*, for respondent.

Motion argued by *Stinson* for relator, and the following submitted :

The State claims, first: That the impeachment by the House attached to these defendants a constitutional disability which suspended them from their offices until that disability should be removed.

The House of Representatives has the sole power to impeach. *Kansas Constitution, Art.* 11, *Sec.* 27.

To "impeach," Webster defines as follows:

" To accuse, to charge with crime or misdemeanor, to exhibit charges of maladministration against a public officer before a competent tribunal."

The same section says: All "impeachments," *i. e.* all charges preferred by the House of Representatives, shall be tried by the Senate. The same section: No person shall be " convicted," not impeached. Showing that the framers contemplated a distinction between a mere impeachment and a conviction on impeachment. The Governor " shall be subject to impeachment," *i. e.* liable to be impeached by the House. *Sec.* 28. Having been " impeached" he may be " convicted or acquitted. *Sec.* 28.

*Art.* 1. *Sec.* 11. In case of the death, impeachment, removal or other disability of the Governor, &c. If the House impeach, the act of impeaching is an " impeachment," and impeachment is a disability. " Impeachment" is the only disability named which can be removed.

Judgment on conviction on impeachment must remove from office. Either punishment presented by Sec. 28, Art, 2, effects a removal, and it is not to be supposed that the framers used the word " impeachment" if they had another word including the idea they intended to express by it.

*Sec.* 13. If the Lieut. Governor    *    *    shall be " impeached" or displaced. Conviction on impeachment works a displacement, so the word impeachment is entirely useless if it means simply what is expressed by displacement.

" Impeachment" is here the only expressed disability which can be removed,

The State ex rel. Adams v. Hillyer.

*Sec.* 14. Applies the disqualifications above mentioned to these defendants.

Compare our constitution with that of the United States.

The sole power to impeach is given to the House of Representatives. *Art.* 1, *Sec.* 3, *subdi* 5.

The punishment is presented in Art. 1, Sec. 3, subdi 6.

Disabilities of the President, removal, death, resignation or inability. Under the constitution of the United States, the President, if convicted on impeachment, must be removed from office. In his case the impeachment does not work a disability.

Under the constitution of the United States it is the judgment which can disturb the President in his office.

How far will the Court inquire into the regularity of the proceedings of the Senate? It has the organization of a Senate, and its proceedings in the trial are on their face regular.

Will the Court inquire into the regularity of the judgments?

The effect of the constitutional provision is "directory" merely. There is no regard to adjournments.

If this Court inquires at all it will only be to ascertain if the Senate was in session at the time the trial was had and judgment pronounced.

The Senate has an organized existence independent of the House. It may be in session legally, without the House, as if the House should fail to meet at the time appointed by law.

Legislative action it is true can only be had by the Legislature; the two branches must concur in the exercise of legislative power. The exercise of the right to try impeachments is not a legislative but a judicial power. It is as independent of the Senate's legislative functions, as are the powers of a judge in chambers from those of a Court.

Impeachments must be tried by the Senate when sitting for that purpose, and not when sitting as a branch of the

Legislature for the purpose of exercising legislative power. Illustrated by constitution of New York, Art. VI., Sec. 1.

For the reason why the House of Representatives or House of Commons attended, see opinion of Attorney General of Missouri, Iackson's Trial, page 24.

The House having impeached, has no absolute control over the proceedings. It exhausted its power when it impeached. The trial could progress in its absence, either actual or constructive.

The Senate sitting to try impeachments, is, in the eye of the law, a different organization from the Senate as a branch of the Legislature.

The constitutional inhibition does not apply save to the Senate as a legislative body. But even if it does apply the consent of the House was obtained fully and completely. *First*, The motion to adjourn was made by the House of Representatives, represented by its managers. *Second*, The resolution of February 26, 1862, gives such consent. *Third*, The law gives the consent in terms.

This was the evident intention of the House. No prescribed form is necessary in which consent shall be given.

The adjournment *sine die* was an adjournment of the Legislature, and made with reference to the previous adjournment of the Senate.

The motion argued by *Wilson Shannon* for respondents, who submitted the following:

I. The word "impeachment" as used in the 11th, 13th, and 14th Sections of Article 1st of the constitution, (page 50,) means a judgment of guilty on impeachment and removal from office, which is the least punishment in such case that can be inflicted. The sections contemplate a vacancy and provide the mode the vacancy may be filled. Every man is presumed to be innocent, until he is found guilty, &c.

The State ex rel. Adams v. Hillyer.

II. The adjournment of the Legislature by a joint or concurrent resolution on the 6th of March, 1862, without day, dissolved that body. The Senate after such adjournment had no legal existence. See the copy of the resolution of adjournment, without day. The Senate after such an adjournment, could not meet for the transaction of any business imposed on them, as a Senate, by the constitution. They can only try impeachment cases as a Senate. Article 2, Sec. 27 of Constitution, page 54, provides that all impeachments must be tried by the Senate. If they had no right to sit as a Senate at the time they heard and decided these impeachment cases on the first Monday in June, 1862, their proceedings are void: their judgment is a nullity. There was no adjournment of the Senate, as provided in the constitution, to the first Monday in June. Section 10, Article 2, of the constitution, provides that neither House, without the consent of the other, shall adjourn for more than two days, Sundays excepted. This adjournment must in all cases be, by a joint or concurrent resolution. Each House must consent to the resolution. The Legislature cannot by law give to one or both branches of the Legislature the right to adjourn for more than two days. If so they could defeat, by a mere law, Sec. 10, Art. 2, of the constitution.

Mr. Plumb's resolution in the House, of the 26th February, (page 8 of pamphlet,) cannot be construed as giving the consent of the House to the passage of the resolution by the Court of Impeachment on the 28th of February. Plumb's resolution is a resolution of instructions to the managers. The will of the House on the 26th is no evidence of the will of the House on the 28th. The House that desires to adjourn for more than two days, must get the consent of the other House, after the passage of the resolution. This can only be done by joint or concurrent resolution, regularly passed through both Houses. But what is the resolution by which it is claimed the Senate

adjourned until the 1st Monday in June. It was made, not by a Senator, but by Mr. Stinson. "We move that the Court do now adjourn to the 1st Monday of June next, at 11 o'clock A. M." This does not purport to be a joint or concurrent resolution. It does not purport to be a resolution of the Senate, but of the Court. *See the pamphlet page* 64, *date of the* 28*th of February*, 1862. The Court, as such, could not adjourn to a time when the Senate was not in session: and much less could the Court adjourn to a time when neither the Senate, nor House, had any legal existence;—to a time when the legislature had been dissolved by an adjournment without day. See the resolution passed by the Missouri Legislature, in the trial of the impeachment of Jackson. A concurrent resolution is introduced in the Senate by which the Senate adjourns for the trial of the case, until the 1st Monday in June, and the House adjourns until the 1st of July, and after that the Legislature adjourns without day, and not before. This shows that, in the opinion of the Missouri Legislature, it was necessary to keep up the legal existence of the House while the impeachment case was being tried—a strong authority in support of the position of the defendants in this case. The opinion of the Attorney General in the Missouri case, only goes to the point that the House need not be in actual session, while the Senate is trying the impeachment. But they must have a legal existence. Hence such existence was continued and no adjournment *sine die*, took place until the Senate had pronounced judgment in the impeachment of Jackson.

The legislative power is a *unit*, though distributed, and the parts can only act in unison. Whenever a part ceases to act, the whole becomes inoperative. 2 *California Report, page* 172—*case of Fowler* v. *Pierce*.

In a recent case of impeachment in California, the question was made, whether it was necessary, that the House should remain in session, while the Senate set to try an

impeachment. It was claimed that it was a useless expense unless it was necessary, the legislative business having been finished. The constitution of that state says that neither House shall adjourn for more than three days without the consent of the other.

The Assembly decided the question against adjourning and remained in session. And it is admitted that all the precedents, without any exception, both in England and in the United States, are this way. I have shown that the case in Missouri is not an exception, for in that case the legal existence of the House was kept alive, and the adjournment, *sine die*, did not take place until the Senate had pronounced judgment in the impeachment case.

The rules of proceeding, and the rules of evidence, as well as the principles of decision, have been uniformly regulated by the known doctrine of the common law, and Parliamentary usage. *Story's Commentaries on the Constitution, Vol. 2, page* 267, *Sec.* 797. See further as to the mode of proceeding in impeachments, in the same Vol., page 275, Sec. 809. There is not then a single instance where the Senate has ever sat in an impeachment case, when the House was not in session, or had no legal existence. The cases under consideration are the only ones where it has ever been attempted.

The adjournment, therefore, on the 6th of March, *sine die*, dissolved the Legislature. Neither the House or Senate had any legal existence, and could not have unless convened by the Governor, or at the regular and real session. These proceedings in June, 1862, were null and void. The judgment rendered could not be pleaded in bar to these cases if called up for trial at the next session. And the Govenor, who was acquitted, cannot plead that acquittal in bar of the case at the next session. There is no dispute as to the facts of this case. They are admitted on both sides, and from these facts it is clear that the body of men who sat in June last, in the trial of these cases,

4

was not, in legal contemplation, the Senate of the State of Kansas, and unless they were, their whole proceedings are void; and being void the informations in these cases must be dismissed.

*By the Court*, KINGMAN, J.

The facts of the case were agreed upon leaving for the Court to decide the single question, whether the session held by the Senate when it tried and pronounced judgment in the case, was a legal and constitutional one.

This is denied on two grounds.

1st. There is no power in the Senate to set for the purpose of trying impeachments when the House is not in session.

2d. If such power exists, the adjournment of the Senate to the 1st Monday in June was without consent of the House, and void; and if valid, was annulled by the subsequent concurrent resolution adjourning the Legislature, *sine die.*

By constitutional provision all impeachment cases are to be tried by the Senate; but as to when the Senate shall set for that purpose or how the trial shall be conducted the constitution is silent except in declaring that the Senators when sitting for that purpose shall be sworn; that the concurrence of two-thirds of the Senators elected is necessary to a conviction, and a limitation as to the extent of the punishment.

In the absence of express provisions it is presumed that the common law "will regulate, interpret, and control the powers and duties of the Court of Impeachment," but this rule, applicable only to the trial and proceedings, affords no guide in determining the question as to the organization of the Court, for in this State the tribunal that tries, as well as the body that prefers the accusation, are entirely unknown to the common law, and if there is such a general resemblance of our legislative assembly to the

Parliament of Great Britain, as to be easily noticed, the points of dissimilarity are still more apparent and striking. And this, not only in the organization and general powers of the two bodies, but even in this matter of impeachment.

By our law the House of Representatives alone can prefer charges of impeachment; by the common law of Parliament, not only the Commons, but a Peer or the Attorney General at the suit of the King may prefer articles of impeachment. (*Com. Dig. V.* 238.)

In prosecutions by the Commons upon an impeachment, it belongs to the Commons to demand judgment, (*Com. Dig. V.* 244,) and the House of Commons have a right to be present whether they appoint managers or not, that every member may satisfy his conscience whether he will give his vote to demand judgment. (*Strafford's Case*, 2 *Commons Journal*, 105-108.)

This right of the Commons to be present in cases where the impeachment was presented by them grows out of the assumed right of the Commons to arrest the prosecution by refusing to demand judgment, even after the person impeached has been found guilty. Such power has never been exercised or claimed in this country by the House exhibiting the accusation, and would be utterly subversive of the independent jurisdiction of the Senate as a Court of Impeachment, by subjecting the judgments of the Senate to the review of the House before they would be of any force or effect.

The reason of the usage or right of attendance upon the trial by the Commons having failed, the rule itself ceases, as we have adopted no more of the common law in this State than is adapted to our situation and applicable to our institutions. The laws of this State, however, by express provision, have empowered the Senate, when sitting as a Court for the trial of impeachments, to hold sessions after the adjournment of the Legislature, and whatever may

have been the rule of common law, it was perfectly competent for this Legislature to prescribe a different rule unless prohibited by the constitution, and we look in vain for any such provision, either express or implied. Nor is there in that instrument any inhibition of the session of one branch of the Legislature when the other is not in session. There is a fixed time when both Houses shall meet, a limitation of the power of one House to adjourn for a longer period than two days without the consent of the other, and in case of disagreement, the Governor may adjourn them.

If it be admitted, as claimed, that when acting in their legislative capacity, the proceedings of one house, when the other is not in session, have no validity, it can only be upon the ground that their legislative power is a unit, though distributed, and the parts can only act in unison, and neither the reason nor principle would apply to this case. But the principle contended for cannot be admitted. If at the commencement of the regular session of the Legislature, the Senate, for any cause, should fail for weeks to organize, there can be no doubt that it would be perfectly competent for the House to perfect its organization, appoint its committees, and initiate legislation. In such case, if after its organization the Senate should pass an Act that had, previous to its organization passed the House in the prescribed constitutional form, would not such be a valid law? The case before the Court presents much stronger reasons why the separate action of one body may be valid in the absence or non-organization of the other, for the Senate acts entirely in a judicial capacity. Its action is independent of the House; and as we have seen, there is no reason why the House should be present or in session, and in the absence of constitutional inhibition we can perceive no reason why the Senate, with the consent of the House, may not adjourn to any period during their term of office, and not beyond the regular

meeting of the Legislature, whether the House be in session or not.  If at such adjourned session its acts were confined, as in this case, to duties in which they were entirely independent of the House or any action it might take, those acts would be valid and conclusive.

Another view of this point in the case will illustrate and strengthen the conclusion.  Had the constitution conferred the power of trying impeachments upon any other tribunal than the Senate, and named no time for the trial, and fixed no limits for adjournment, no one would have the hardihood to deny that both these matters might be regulated by law.

In this State the Legislature has given express power to the Senate, when organized and sitting as a court for the trial of any impeachment, to adjourn from time to time and hold a session after the adjournment of the Legislature.

Such a law is clearly within the province of the Legislature to enact, but would of course be limited by the last clause of Sec. 10, Art. 2 of the constitution, so that such adjournments can only be made by consent of the House. The law may well be taken as the clearly manifested consent of the House that passed it, that the then Senate might adjourn and hold sessions after the Legislature, but not as the consent of any subsequent House that such sessions may be held.

But it is denied that the House ever gave its consent to the adjournment of the Senate till June.

So much of the action of the two Houses in the premises as is necessary to understand this point, is as follows, as shown in the agreed facts of the case:

On the 26th of February, A. D. 1862, in the House, Mr. Plumb offered the following resolution, which was adopted:

"*Resolved,* That the Board of managers on the part of the House be instructed to move that the first Monday in

June be set apart for the trial of the cases of impeachment against the State officers."

On the 27th of February, Mr. Anderson by consent, offered the following resolution, which was adopted:

" *Whereas*, It has come to the knowledge of this House that there are material and important witnesses, on the part of the prosecution of the impeachments now pending before the Senate, in Washington, to-wit: James C. Stone, S. C. Pomeroy, George W. Collamore and Martin F. Conway, and that D. H. Wier, Chas. Chadwick and James H. Lane, have left this city since the initiation of these prosecutions, and the House is unable at present to ascertain where the said Lane, Wier and Chadwick are at this time: and

*Whereas*, These prosecutions nor neither of them can be conducted with effect without the testimony of said witnesses, and the said witnesses are material and important for said prosecutions without whose evidence this House cannot safely proceed to trial; therefore, be it

*Resolved*, That the Board of managers· be requested to present this preamble and resolution to the Senate and ask that the trial of these impeachments be postponed until such time as in the opinion of the Board will enable said managers to procure the testimony of said witness."

And on the 28th February, in the Senate sitting as a Court of Impeachment, the following proceedings were had:

Hon. S. A. Stinson on the part of the managers submitted the following motion:

" We move that the Court do now adjourn to the first Monday in June next, at 11 o'clock, A. M., which motion prevailed.

Also· an Act which was introduced into the House on the 21st February and was finally passed by both Houses on the 1st day of March, providing:

"That the Senate of the State of Kansas when organized and sitting as a Court for the trial of any impeachment brought by the House of Representatives, shall have power to adjourn from time to time, and hold sessions after the adjournment of the Legislature."

These different acts of each House and of both Houses of the Legislature relating to the same subject matter, are both to be taken together.

The passage of the resolution by the House on the 26th of February, asking the Senate to set the trial for the 1st Monday in June, and the adjournment of the Senate sitting as a Court till that time cannot be viewed in any other light than as the consent of the House, previously given, to such an adjournment.

The constitution prohibits the adjournment of one House for more than two days without the consent of the other, but does not point out how or when that consent shall be given. It would be difficult to conceive of a stronger manner of giving that consent than by previous request, reiterated, as in this case, that it be done. But to avoid all cavil the law above quoted was passed the next day, and was in the most solemn manner and with all the forms of legislation, a declaration of the consent of that House, that the then Senate might adjourn at its pleasure and hold sessions after the adjournment of the Legislature. It is essential to the validity of a contract that each of all the parties to it should give his assent to its terms. Yet few contracts upheld and enforced by the Courts present so strong and varied evidence of the assent of the parties as this case does of the consent of the House to the adjournment of the Senate till the first Monday in June.

But it is insisted that the concurrent resolution adjourning the Legislature *sine die* on the 6th day of March, 1862, dissolved both branches of the Legislature finally, and they could not be convened again save by an exercise of executive power. It is evident that each branch of the

Legislature considered this resolution with reference to the previous adjournment of the Senate sitting as a Court of Impeachment, and the law which had just been enacted; and this is the plain sense and clear legal import of the several acts. The Senate, sitting as a Court, having adjourned its sessions as such, to the 1st Monday in June, united with the House in a concurrent resolution to terminate their Legislative sittings by an adjournment *sine die* on the 6th of March. This is all that the language of the resolution would indicate and all that was intended; and the meeting of the Senate as a Court in June was not in conflict with it, and it must be so held.

All the Justices concurring; EWING, C. J., BAILY and KINGMAN on the bench.